IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM GALBRAITH,

      Plaintiff,

    v.

MML INVESTOR SERVICES, INC.,
and MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,

      Defendants.

No. CV 09-437-MO

OPINION AND ORDER

**MOSMAN, J.**,

    Over an eleven-year period from 1995 to 2006, securities broker Charles Wesley Rhodes Jr. engaged in a Ponzi scheme that defrauded several investors, including plaintiff William Galbraith, of over eleven million dollars. *S.E.C. v. Rhodes*, No. CV-06-1353-MO, 2009 WL 1227774 (D. Or. May 4, 2009). Mr. Rhodes was employed as a registered representative of defendants MML Investor Services, Inc. and Massachusetts Mutual Life Insurance Company (collectively, "MML") from 1995 until August 31, 1998. Upon learning of the fraud, Mr. Galbraith sued MML alleging claims for securities fraud, negligence, common law fraud, and breach of fiduciary duty based primarily on MML's failure to warn Mr. Galbraith about Mr. Rhodes' illegal conduct. (Compl. (#1) ¶¶ 28, 35-36, 39, 45.) The Complaint seeks damages not only for investments made while Mr. Rhodes was a registered representative of MML, but also

PAGE 1 OPINION AND ORDER

for thousands of dollars worth of investments made from August 31, 1998 to 2006, when Mr. Rhodes was employed by other companies. (*Id.*)

Earlier in this case, MML filed a Motion to Dismiss Mr. Galbraith's second claim for negligence (#4), arguing that MML and Mr. Galbraith did not have a "special relationship" that would give rise to MML's liability under Oregon law. (Mem. in Supp. of Defs.' Mot. to Dismiss (#5) 12-14). At oral argument held on August 20, 2009, the Court granted in part and denied in part MML's motion to dismiss, holding that a special relationship could have existed between MML and Mr. Galbraith, but only while Mr. Rhodes was associated with MML from 1995 to August 31, 1998. The Court then ordered Mr. Galbraith to amend his complaint and limit his claims to the period in which the special relationship existed. (Mins. (#19); Mot. Hr'g Tr. 46:11-47:4, Aug. 20, 2009.) After Mr. Galbraith filed an amended complaint (#20), MML filed a second Motion to Dismiss (#21) that is now before the Court. In its motion, MML argues that Oregon's common law economic loss doctrine and its "blue sky law," ORS 50.005 to 59.445, both preclude recovery for investments made after Mr. Galbraith's and Mr. Rhodes' relationships with MML ended on August 31, 1998. For the reasons stated below, I GRANT the motion.

## STANDARD OF REVIEW

When analyzing a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the court must accept as true the factual allegations contained in the complaint and construe them in the light most favorable to the plaintiff. *Mishler v. Clift*, 191 F.3d 998, 1002 (9th Cir. 1999). Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Id.* "The issue is not whether a plaintiff will ultimately prevail but whether [he] is entitled to *offer* evidence to support

PAGE 2 OPINION AND ORDER

the claims." *Cervantes v. City of San Diego,* 5 F.3d 1273, 1274 (9th Cir.1993) *(*quoting *Scheuer*

*v. Rhodes,* 416 U.S. 232, 236 (1974)) (emphasis and alteration in original).

**DISCUSSION**

**I.**    **Motions to Dismiss Based on the Economic Loss Doctrine**

MML now moves the Court to dismiss Mr. Galbraith's second, third, and fourth claims

for negligence and breach of fiduciary duty "to the extent they are based on events, actions,

investments, or other allegations occurring on or after September 1, 1998"—the date Mr. Rhodes'

association with MML and MML's special relationship with Mr. Galbraith ended. (Mem. in

Supp. of Defs.' Mot. to Dismiss First. Am. Compl. (#22) 1.) The issue is whether MML can be

held liable for investments occurring after the special relationship ended if subsequent

investments are a foreseeable consequence of duties breached while the special relationship

existed. The answer to that question depends largely on whether the special relationship between

MML and Mr. Galbraith defines the scope of MML's duty to Mr. Galbraith, or whether the duty

is limited only by general concepts of foreseeability. *See Allstate Ins. Co. v. Tenant Screening*

*Servs. Inc.*, 914 P.2d 16, 20-22 (Or. App. 1996). Because the special relationship is based on the

principle that a broker entrusted with a client's money must exercise a heightened duty of care

with respect to that money, I conclude that the nature of the special relationship limits the scope

of MML's duty to only those investments made before September 1, 1998.

**A.**    *Background*

MML's first motion to dismiss was based on a common law rule that limits tort liability

where a plaintiff's damages are entirely financial ("economic loss"), as opposed to damages that

involve injury to person or property. *Onita Pac. Corp. v. Trs. of Bronson*, 843 P.2d 890, 896 n.6

(Or. 1992). Under Oregon law, "a negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Id.* at 896. A defendant may have a heightened duty giving rise to liability for pure economic loss where the defendant and the plaintiff are in a "special relationship." *Id.* at 899. Special relationships can be created when the plaintiff hires the defendant in a professional context or when the plaintiff "has relinquished control over the subject matter of the relationship to the [defendant] and has placed its potential monetary liability in the [defendant's] hands." *Conway v. Pac. Univ.*, 924 P.2d 818, 824 (Or. 1996).

In its first motion to dismiss, MML argued that Mr. Galbraith could not show that a special relationship existed between MML and Mr. Galbraith, which meant that Mr. Galbraith could not hold MML liable for his pure economic loss. (Mem. in Supp. of Defs.' Mot. to Dismiss (#4) 12-14.) The Court rejected MML's argument, finding that Mr. Galbraith had alleged a broker-client relationship through which MML could have assumed a heightened duty beyond the general duty to avoid foreseeable harms. (Mins. (#19).) For purposes of deciding MML's current motion, the language of the Court's prior decision is particularly relevant:

> It is my view that [counsel for MML] has the correct argument that the special relationship can only exist while Wes Rhodes was associated with MML. That doesn't mean that consequential damages can't flow months or years later, but they flow from acts of fraud or investments that occurred while that special relationship . . . existed between the investors and Wes Rhodes and Wes Rhodes and MML.
>
> So, for example, it's my own view that plaintiffs can't allege such a special relationship for investments that occurred through Wes Rhodes while he was associated with Charles Schwab or anyone else besides MML.
>
> And I will require the plaintiff to replead those claims, limiting them to the period

PAGE 4 OPINION AND ORDER

where such a relationship could have existed; that is, the period of Wes Rhodes'
association with MML, and only those investments that occurred during that period.

(Mot. Hr'g Tr. 46:12-47:4.)

In response to the Court's Order, Mr. Galbraith's First Amended Complaint added the
following allegations to his negligence claim:

> Of the total amount out of which Plaintiff was defrauded, $90,000.00 was entrusted
> with Rhodes through investments made with Rhodes during his employment with
> Defendants, and an additional $554,764.00 was invested with Rhodes' various
> companies after his employment with Defendants was terminated. But for the
> negligent acts of Defendants that occurred while Defendants maintained a special
> relationship with Plaintiffs, Plaintiffs would not have been defrauded the amount
> invested after Rhodes' employment was terminated, and therefore, those losses
> flowed as a direct and foreseeable result from the negligence of the Defendants.

((#20) ¶ 36.) Essentially, Mr. Galbraith's amendment recharacterizes the damages he suffered
after August 31, 1998 as consequential damages arising out of negligence committed while his
special relationship existed.

### B.    *The Scope of MML's Duty to Mr. Galbraith*

Mr. Galbraith alleges that he shared a special relationship with MML between 1995 and
August 31, 1998, and the allegation was sufficient to survive MML's first motion to dismiss.
(Order (#19)). The Court now considers the scope of MML's duty to Mr. Galbraith within that
special relationship.

A duty is "simply an expression of the sum total of those considerations of policy which
lead the law to say that the particular plaintiff is entitled to protection." *Fazzolari ex rel.
Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326, 1335 (Or. 1987) (quotation omitted). In
limiting liability for pure economic loss, Oregon law distinguishes between a general duty to
avoid foreseeable harms and a duty imposed by some other legal principle, such as a special

PAGE 5 OPINION AND ORDER

relationship. *Onita*, 843 P.2d at 896; *Fazzolari*, 734 P.2d at 1337. It is this distinction that led the *Onita* court to conclude that "[f]oreseeability alone is not a sufficient basis to permit the recovery of economic losses on a theory of negligence." 843 P.2d at 900. But although *Onita* explains that only certain kinds of duties give rise to liability for pure economic loss, it does not define the scope of those duties where they are found to exist. *Allstate*, 914 P.2d at 20-21.

The scope of a duty may be created, defined, or limited by the nature of the special relationship, the general concept of foreseeability, or both. *Id.* at 21. "[W]hen a special relationship . . . gives rise to the duty of care, that relationship . . . *may* also define the scope of the duty by specifically describing the types of harms or class of persons that it encompasses." *Id.* (emphasis in original). But when a special relationship does not define the scope of a duty, the scope of the duty is limited only by the common law principles of foreseeability. *Id.*; *see also Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 328 (Or. 2004).

Courts generally define the scope of a duty by reference to the specific class of harms that the special relationship seeks to prevent. *See Simpkins v. Connor*, 150 P.3d 417, 422 (Or. App. 2006) (evaluating whether a statute imposed a duty). Here, the scope of the broker-client duty may be defined by looking at the policy considerations that lead Oregon law to recognize a special relationship between broker and client. Importantly, not all broker-client relationships are deemed special relationships. Rather, "[a] stockbroker is a fiduciary if his client trusts him to manage and control the client's account and he accepts that responsibility." *Wallace v. Hinkle Nw., Inc.*, 717 P.2d 1280, 1282 (Or. App. 1986). Conversely, a fiduciary relationship will not arise if the broker exercises no control over a client's investment decisions. *Berki v. Reynolds Secs., Inc.*, 560 P.2d 282, 286 (Or. 1977). It is the client's decision to relinquish control over his

PAGE 6 OPINION AND ORDER

or her money and place it in the broker's hands that imposes a duty of care on the broker with respect to that money. *See Conway*, 924 P.2d at 824 ("In [these kinds of] relationships, one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party."); *see also Or. Steel Mills*, 83 P.3d at 331 (limiting the scope of an accountant duty to acting "with reasonable competence in performing the professional services for which it was retained"); *Lewis-Williamson v. Grange Mut. Ins. Co.*, 39 P.3d 947, 949 (Or. App. 2002) ("[A]n insurance agent acting as an agent for the insured owes a general duty to exercise reasonable skill and care in providing the requested insurance."). Because the duty arises from the broker's ability to exercise independent judgment with respect to a client's money, it follows that the broker's duty extends only to the money entrusted in the broker's care.

Based on the foregoing analysis, I conclude that MML's duties toward Mr. Galbraith extend only to investments made while Mr. Rhodes acted as MML's registered representative. Once the special relationship ended, MML's had no right of control with respect to Mr. Galbraith's subsequent investments with Mr. Rhodes. Therefore, MML's duty did not extend to these subsequent investments, even though the act of future investment itself may have been a foreseeable consequence of duties breached during the special relationship. I therefore grant MML's motion to dismiss Mr. Galbraith's second, third, and fourth claims, to the extent those claims are based on investments made on or after September 1, 1998.

## II.    **Motion to Dismiss Based on Oregon's Blue Sky Law**

MML also seeks to dismiss Mr. Galbraith's first claim for securities fraud under the blue

PAGE 7 OPINION AND ORDER

sky law "to the extent they are based on events, actions, investments, or other allegations occurring on or after September 1, 1998."[1] (Mem. in Supp. of Defs.' Mot. to Dismiss First. Am. Compl. (#22) 1.) The blue sky law limits liability to an individual who "[s]ells or successfully solicits the sale of a security" in violation of Oregon Securities Law or by means of a materially misleading statement or omission. ORS 59.115(1). A party may be liable for another seller's violations of the blue sky law if the party "directly or indirectly controls a seller" or "participates or material aids in the sale." ORS 59.115(3).

Under Oregon law, a party may materially aid a sales transaction by establishing a salesperson's credibility and helping that salesperson obtain a customer base. *Gonia v. E. I. Hagen Co*, 443 P.2d 634, 636 (Or. 1968); *Kelly v. Ford*, No. 90-35310, 1991 WL 40337, at *1 (9th Cir. Mar. 25, 1991). Mr. Galbraith alleges that he would not have invested with Mr. Rhodes if Mr. Rhodes had not been affiliated with MML. (First. Am. Compl. (#20) ¶ 28.) The First Amended Complaint further states that MML and Mr. Rhodes promoted their relationships with one another, that MML recruited clients for Mr. Rhodes, and that Mr. Galbraith received statements from Mr. Rhodes on MML letterhead. (*Id.* ¶¶ 6, 12.) These allegations support a claim that MML materially aided Mr. Rhodes by giving investors confidence in him and by helping him develop his customer base—at least during the period in which Mr. Rhodes was affiliated with MML.

Once the employment relationship between MML and Mr. Rhodes ended, however, MML no longer engaged in the activities that materially aided Mr. Rhodes. Mr. Galbraith's

---

[1] MML concedes that it may have directly or indirectly controlled Mr. Rhodes within the meaning of ORS 59.115 while Mr. Rhodes worked as its registered representative.

statements no longer appeared on MML letterhead. MML no longer promoted its affiliation with Mr. Rhodes or recruited clients for him. There is no allegation that MML assisted Mr. Rhodes outside of this employment context. Because MML aided Mr. Rhodes only to the extent that an employer supports its employee, MML could not materially aid the sales that Mr. Rhodes made while he was working for someone else. Therefore, Mr. Galbraith's first claim is dismissed to the extent it is based on events or investments that took place after MML ended its relationship with Mr. Rhodes.

## CONCLUSION

For the foregoing reasons, MML's motion to dismiss (#21) is GRANTED. Mr. Galbraith's first, second, third, and fourth claims are dismissed to the extent that they are based on actions taken by MML, or investments made by Mr. Galbraith, on or after September 1, 1998.

IT IS SO ORDERED.

DATED this _11th_ day of December, 2009.

/s/ Michael W. Mosman____
MICHAEL W. MOSMAN
United States District Court